BERNARD THORNTON & wife vs. THE SUFFOLK MANUFAC-
TURING COMPANY.

A usage among the manufacturing corporations at Lowell, to give an honorable dis-
charge to an operative who has worked faithfully with them for twelve months,
and has given a fortnight's notice of an intention to leave, whereby such operative
may obtain employment in other mills at Lowell, does not render it obligatory
upon those corporations to give such discharge in all cases where the foregoing con-
ditions are complied with; but the giving of such discharge is a matter of dis-
cretion and judgment with the corporation.

ACTION OF CONTRACT for the breach of an agreement under
which the female plaintiff, Catherine Cassidy, before her mar-
riage, worked in the manufactory of the defendants, at Lowell.

This agreement and breach were alleged in various forms in
the several counts of the declaration, but in all it was substan-
tially claimed that the female plaintiff went to work for the
defendants under the agreement that if she faithfully per-
formed her duties in their employ for the term of at least
twelve months, at the expiration of such period, upon giving
a fortnight's notice, she would be entitled to leave, and to re-
ceive from them "a line," or honorable discharge, by means
of which she might obtain employment in the other mills in
Lowell. It was also alleged that there was an agreement
among the several manufacturing companies in Lowell, that if
an operative did not receive such "line" or honorable discharge,
he could not afterwards obtain employment in any other of
the mills in Lowell. It was also alleged that the female plain-
tiff faithfully performed services for the defendants for more
than twelve months, and became thereby entitled to such dis-
charge, or "line," upon giving a fortnight's notice of her inten-
tion to leave, and working for that period; but that the de-
fendants, regardless of their contract, wrongfully discharged
her without such "line," and thereby deprived her of work in
any other mill in Lowell.

The defendants pleaded the general issue, and specified for
defence that she was discharged for various improprieties of
conduct.

At the trial in this court before *Fletcher*, J. the plaintiffs called Alexander P. Wright. He testified : " I am agent of the Lowell (carpet) company ; have been so for about twenty-three years ; am generally acquainted with the rules and customs of the Lowell companies. I know of no certain agreement between companies to require a ' line ; ' I believe the custom is to require a ' line' wherever an operative has been previously employed in other mills in Lowell, or not to hire them. Our company require it ; never have known of hiring an operative when they have been discharged from another company without a line, if it was known ; the invariable custom is to give a line if there is no objection to the conduct of the help from the overseer ; never have known any difference for twenty-three years that I have been here ; if the help work properly it is usual to give a line ; there may be cases of opposition on the part of the overseers, but this is usually for cause. I never have known an overseer to refuse arbitrarily, but always for cause shown ; if help work a year, and give a fortnight's notice, they are entitled to a ' line ; ' this is a general custom, and understood by all concerned ; so far as I know, the help hire with knowledge of this custom ; if a line is refused by the overseers they apply to me. I should say improper conduct is the only cause of refusal ; if the overseer refuses a line, he makes his statement to me. I should say bad temper, producing disturbance in room, would be sufficient cause of discharge ; any such conduct as would render the hand unserviceable elsewhere, such as insulting the overseer, trying to get other hands discontented. I know of no right in operatives to demand a line ; this line is like a recommendation to a servant in a family ; the regulation paper is the substance of the contract. I should suppose it optional with the overseer whether he gave a line or not ; in a given case, if the hand says, ' if you don't hire A. B. I will leave,' and unreasonably persists, I should justify the overseer in discharging without a line. I would not justify him for putting on the discharge, ' discharged for improper conduct' for such a cause, but if he explains the necessity that he should not hire A. B., and the hand persists, I should call that improper conduct."

32 *

John B. McAlvin testified: " I have been paymaster on the Suffolk for eighteen years; have the books of the company in my hands; it appears from this book that the plaintiff came to work for the company, May 29, 1848, and was discharged, July 19, 1849; the entry is, 'discharged for improper conduct.' I know the handwriting of John Clark; this paper handed me is in his handwriting; it is one of the blanks furnished by the Suffolk Company to their overseers, filled up by Mr. Clark, as follows: ' Suffolk Dressing Room, No. 3. Catherine Cassidy, has worked since pay-day, thirteen days; pay her for warping nineteen beams, at 22c. per beam, $6.08. John C. Clark, overseer. Discharged for improper conduct, July 18, 1849. She has worked in this room          months. She leaves with notice.' If the blank is filled up, namely, has worked here *twelve* months, and leaves with notice, I should give a line, but should generally ask the overseer; giving her a line would be a compliance with the rules of the Suffolk company, if she worked twelve months and left with notice; if she leaves with notice, it would be a compliance with rules to give her a line, but of late years I have usually asked the overseer, if there is any objection to her having a line; this custom of giving a line is well understood both by the company and the operatives; impropriety of conduct, such as deviating from the rules of the room, would be a cause of discharge; these rules are posted up; this is a copy of the regulations given to the operative.

" If a hand is discharged for improper conduct, it would only be for such conduct that she could not be taken back without an acknowledgment to her overseer; this conduct might be in disobeying the rules of the room in various ways. I should say that giving notice of intention to leave, would not on her part be such disobedience to the rules as to be a cause of discharge; the rule amongst the companies in Lowell is not to employ a hand who has worked for any company in Lowell, and been discharged without a line. This is the rule of the Suffolk Company I know, and presume it is so in the other companies; and I presume so, because notices came to the Suffolk Company from the other companies, that hands

have been so discharged, and they are not to be employed. The rule further is to give notice to all other companies when a hand has been discharged without a line, so such hand may not be employed, but this is not always done; seldom send a notice or receive one; I can't say whether one was sent or not in the plaintiff's case. Soon after she left, she came to me with another woman; brought me this bill, (the one signed by Clark,) and demanded a line; I told her I could not give her a line. If the bill comes from the overseer in this form, by the rules, I cannot give a line or honorable discharge. I told her to go to the overseer, and she went out as if to go to see him. If the hand comes with a bill in the form of this one we do not give a line; it is our usual practice not to give a line without seeing the overseer, to see if there are objections. I know of no other contract with the hands than that contained in the regulation paper mentioned. My business is paymaster, I have nothing to do with hiring or discharging hands, this is done by the overseers. The help go to the overseer and make their engagements with him as to what price they are to have, and how they are to be employed, and then come to the counting-room and get the regulation paper; the price is fixed for the various kinds of work by the overseer who engages the help; these regulations are given to all the hands employed; the rules of the room are verbal, and are such as relate to fires."

James Montague testified: " I have lived in Lowell twelve years; have known the female plaintiff four years; she has worked in the mill since I knew her; she lived next door to me with her mother; her father was dead; she has worked with the Suffolk Company; after she was discharged she requested me to go to the company and get an honorable discharge for her. I called on Mr. Clark, her overseer, to give her a discharge or a line so she could get work in the other factories in Lowell, as she had a crippled mother dependent on her. He said he would not give her an honorable discharge, or a line, though she might come back and work there. This is the discharge I showed to Mr. Clark; I told him I thought it a rather hard discharge. I told him how hard it

was for her and her mother; and, after some talk, he said he would go and see Mr. Wright, the agent, and it might be arranged. We went to see Mr. Wright; I told him the same I had told Mr. Clark. Wright said that he would not give her a line, but that she might come back; assured her that she was a very good girl, there was nothing against her. This was in October, 1849. I then told Mr. Wright I thought there would be some trouble about it, that she would prosecute; he said he would spend $5,000 rather than change the line he had given her, and I left."

William Markland testified : " I am overseer in Lowell Company; have been so five years, but have been employed there ten years. The female plaintiff applied to me for work in our company, August 2, 1849; got work, and worked six and three-fourth days at that time; she left because she could not get a line from the Suffolk Company, the last place where she worked; she could not give me a line so as to have a regulation paper from our company; she appeared to do well so far as I could see, and I was satisfied with her. She began to learn to weave; this was new business to her, and could at first earn at it only fifty cents per day; a good weaver can earn from seventy-five to eighty cents per day. I don't know as there is any specified rule, but it is necessary, as I understand it, to have a line before a hand can get work who has worked in Lowell before. If they work twelve months, and give a fortnight's notice, they are entitled to a line, as I consider it; this has always been my practice; I have never done any other way. I hired myself with this understanding when I came to work for the company. I hire my own help with this understanding. I have twenty-two men, four boys, and one hundred and thirty-five girls under me; they are frequently changing; the operatives all understand this rule about a line so far as I know. After she left, because she could not get a line, she came back December 31, 1849, and brought a line from the Merrimack Company; I then employed her for thirteen months; she was an average good weaver, and did an average quantity of work; she made about eighty cents per day; I can't tell exactly how much. I found

her a fair hand and had no difficulty with her. I suppose it is a matter of discretion with the overseer whether he will give a line; it is so with me; but I never refused one without a cause; disobedience is sufficient."

Homer Bartlett testified: " I have been employed as agent and treasurer of the Massachusetts Mills, since 1839. Am now treasurer. I know the rules of the Massachusetts Mills. I know the general rules amongst companies of Lowell. There are various well defined and understood rules among the companies here, about the employment of their help; one of these rules is, that if help have been employed on any corporation in Lowell, they must bring a certificate of regular discharge, in order to obtain employment in any other mill in Lowell. If help have worked at least twelve months in a mill, and observed the rules, they are entitled to a line, and I understand it to be the business of the agent to give them one. This rule is generally understood, I have no doubt, amongst the operatives in Lowell; I believe this rule to have a salutary effect upon the operatives. If a girl works a year and fulfils all her duties, and asks for a line, I should give it to her; I never refused one under these circumstances; this is well understood amongst the operatives in Lowell; some new ones from the country may not understand it. I suppose the rule to be the same on all the corporations in Lowell. If a girl should treat her overseer with disrespect, should neglect her work, create insubordination, or in any other way be guilty of misconduct, this would deprive her of a line. I consider it the duty of the officers of the company to judge what will excuse giving a line. It is a matter of course to give an operative a line if she has complied with the regulations; but if she has been guilty of any impropriety, it is not a matter of course. I cannot say that the line is claimed as a right. The only contract I know of is, simply the regulation paper, which they show to the overseer, and he returns it to them. I always give a line to a girl unhesitatingly, who has worked twelve months and conformed to the rules."

Bridget Gaiten testified: " After the female plaintiff was discharged from the Suffolk, I went with her to the Boott

Mills to get work; she engaged work with the overseer, and went to the counting-room to get her regulation paper, and they asked her for her line; she showed them the one she had; they said that would not do, she must go to the Suffolk and get a line. I went with her to the paymaster, and she asked him for a line; he said he could not give one, she must get one from her overseer. We went to the overseer, and he said that he would not do any thing about it, it was left at the counting-room; she did not get a line, and came away."

The plaintiffs here rested their case, and at the suggestion of the presiding judge, the case was withdrawn from the jury, and reported to the whole court for their opinion upon the matter of law. If upon this evidence, a verdict for the plaintiffs could be supported, then the case is to be sent to a jury; if not, the plaintiffs to be nonsuit.

*B. F. Butler*, for the plaintiffs.

*I. S. Morse*, for the defendants.

Shaw, C. J. In this action, brought by Catharine Cassidy, whilst sole, we see no ground on which the plaintiffs can recover, as upon a contract. The ground relied on is, that in consideration of services, the employer engages that if the operative remains in the service a certain time, he will give her an honorable discharge; or in other words, that her service and conduct have been good and satisfactory. Were such a contract made in express terms, intended to be absolute, it seems to us that it would be bad in law, as plainly contrary to good morals and public policy. Such a discharge is a certificate of a fact; but if the fact is otherwise, if the conduct of the operative has not been satisfactory, it would be the certificate of a falsehood, tending to mislead and not to inform other employers. Besides; if such a custom were general, such a discharge would be utterly useless to other employers and utterly worthless to the receiver. It could give other employers no information, upon which they could rely. To avoid such illegality, it must be taken with some limitation and qualification, to wit, that the conduct of the operative has been such in all respects, including not only skill and industry in the

employment, but conduct in point of morals, temper, language, and deportment, and the like, so that a certificate of good character would be true. Then it stands upon the same footing with the custom which governs most respectable persons in society, upon the termination of the employment of a servant, to give him a certificate of good character, if entitled to it. In such case, it is for the employer to give or withhold such certificate, according to his own conviction of the truth, arising from his own personal knowledge, or from other sources. It is the state of the employer's mind, his belief of the good character of the servant, or the contrary, which other employers desire to know, and have a right to know. It must therefore necessarily depend upon the employer's own determination, when so applied to for a certificate, whether with a just regard to truth and honesty, he can certify to the good character or not. If an assurance of an employer on engaging a servant, that at the end of the time he will give him a certificate of good character, if he should then think him entitled to it, could in any respect be deemed a contract, and not the promise of an ordinary act of courtesy, it would be no breach of such contract, to aver and prove that the servant, after the termination of the service, demanded such certificate, and was refused it.

If these considerations have weight and force, in regard to the obligations and conduct of persons, acting in their own right, *à fortiori* in regard to corporations, who can only act and bind themselves by agents and servants. If they were under any obligation, express or implied, to give an operative a certificate of good character, conduct, and behavior, on leaving the service, they could only know the truth of the facts, of such good conduct and behavior, by the report of the superintendent under whom such operative may have been employed. He alone may know the facts and be able to state them. Should they certify to good character without, or against such report, they might certify to a falsehood, and only mislead those who should rely upon such certificate. This certainly they cannot be legally obliged to do. When therefore the overseer certifies that the operative

is discharged for impropriety, as in the present case, this evi-
dence must be conclusive with the corporation, because they
can have no other to justify them in giving a certificate.

It is said by way of objection to this, that an overseer may
arbitrarily refuse to certify a good character, or falsely certify
a bad one.   This is possible, and if he does it capriciously, or
without cause, it is extremely dishonorable and wrong, and
would tend soon to impair his own reputation and standing
for honesty and uprightness.   Still, when an appeal is neces-
sarily made to a man's own personal knowledge, judgment,
and conscience, his decision must be presumed to be accord-
ing to the truth, and conclusive.

And we think the general tendency of the evidence offered
is to prove what we have supposed it must be, not an in-
variable custom or absolute implied undertaking of the cor-
porations, to give an honorable discharge after a year's service,
and notice, but only *sub modo*.   In law this is no ground of
objection ; it is not customary to withhold it, except for cause.
The fact, that on account of the peculiar situation of the vari-
ous companies in Lowell, in relation to each other, the com-
mon interest they have in maintaining their discipline, the
certificate of good character is of so much more importance
to the servant, than elsewhere, can make no difference to the
servant, in regard to his rights.   In the same proportion in
which it is important to the servant out of employ, to hold a
certificate of good character and honorable discharge, it is im-
portant to corporations, their agents and servants, and all in-
terested in them, to be cautious and conscientious, in giving
such discharges and recommendations, when they are honestly
deserved, and in withholding them when they are not.

The court are of opinion, that upon the evidence adduced,
a jury would not have been warranted in finding a verdict for
the plaintiffs, and therefore that the nonsuit must stand.

*Plaintiffs' nonsuit.*